This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant, William E. Miller, appeals from the judgment of the Wayne County Court of Common Pleas whereby Defendant was found guilty of illegal manufacture of drugs. We affirm.
 {¶ 2} On August 22, 2001, the Wayne County Grand Jury indicted Defendant on one count of illegal manufacture of drugs, in violation of R.C. 2925.04(A) and one count of aggravated possession of drugs, in violation of R.C. 2925.11. On February 4, 2001, Defendant filed a motion for leave to file a motion to suppress evidence. The court granted the motion and Defendant filed a motion to suppress evidence the following day. A hearing was held; on March 18, 2002, the motion was granted.[1]
Consequently, the State was unable to prosecute the aggravated possession of drugs charge.
 {¶ 3} The case proceeded to trial. The jury returned a guilty verdict on March 20, 2002. Defendant was subsequently sentenced to a definite term of five years imprisonment. Defendant timely appealed, raising two assignments of error for our review.
 ASSIGNMENT OF ERROR I {¶ 4} "Defendant['s] * * * conviction was against the manifest weight of the evidence and contrary to law."
 {¶ 5} In his first assignment of error, Defendant maintains that his conviction for illegal manufacture of methamphetamine was against the manifest weight of the evidence presented at trial. We disagree.
 {¶ 6} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citing State v. Thompkins (1997), 78 Ohio St.3d 380,390 (Cook, J., concurring). When a defendant maintains his conviction is against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Otten (1986), 33 Ohio App.3d 339, 340. This power is to be invoked only in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id.
 {¶ 7} Defendant was found guilty of, and appeals his convictions for illegal manufacture of drugs, in violation of R.C. 2925.04(A). Illegal manufacture of drugs is defined as "knowingly manufactur[ing] or otherwise engag[ing] in any part of the production of a controlled substance." R.C. 2925.04(A). One "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Manufacture" means to "plant, cultivate, harvest, process, make, prepare, or otherwise engage in any part of the production of a drug, by propagation, extraction, chemical synthesis, or compounding, or any combination of the same, and includes packaging, repackaging, labeling, and other activities incident to production." R.C. 2925.01(J). Methamphetamine is a Schedule II controlled substance. R.C. 3719.41, Schedule II (C)(2).
 {¶ 8} Steven ("Steven") and Heather ("Heather") Fox, Beth Ray ("Ray"), and Christina Dyer ("Dyer") testified for the prosecution. Steven and Heather testified that Defendant had been residing with them at 223 Curry Court for the months of June and July of 2001. Both recalled that Defendant had stored some of his items in their home and across the street in a garage rented by Steven. Shortly after Defendant began living at Curry Court, Steven and Heather began to notice strange odors coming from the basement. Steven explained that it smelled like acetone or lighter fluid; Heather remembered a paint thinner scent. Steven stated that he confronted Defendant about the smell and Defendant had "told [him] it was chemicals used to make crystal meth." Steven further stated that he "let it slide" at first because he was not familiar with the process and was interested to see if Defendant could actually manufacture the substance. He testified that although he never watched Defendant perform the entire process from start to finish, he did watch Defendant perform various stages of the process on several occasions. Steven asserted that Defendant had successfully manufactured two batches. He last observed Defendant "cooking" in the Curry Court home on July 6th or 7th, 2001. Steven recalled the process as being very sterile in nature; Defendant had to wear gloves. Steven testified that he did not partake in the manufacturing because a sterile environment was required. He also stated that methamphetamine was not "his drug of choice." Instead, Steven declared that he preferred cocaine and admitted to having several cocaine-related possession and trafficking indictments and convictions.
 {¶ 9} Once Defendant achieved success, Steven then requested that Defendant move the equipment out of his home. Steven later found out that Defendant moved the items up to the attic after he received a phone call about a fire that had started in his home. Steven was at a friend's house at the time the fire occurred. Upon returning home, Steven recalled finding "places on the floor where [he] could see chemicals were on fire" and Defendant up in the attic "cooking."
 {¶ 10} Steven then decided to call the Medway Drug Enforcement Agency ("Medway") in hopes of speaking with a certain individual he confided in years before. Steven explained that he was concerned that he would be back in prison and subsequently lose his wife, baby, and home. The smell from Defendant's lab was emanating from the house and Steven was fearful that others would become curious and begin asking questions. On July 18, 2001, he spoke with Agents Charles Defelice and Chuck Ellis and "asked them what kind of deal could [be] work[ed] out[.]" Steven testified that a deal was not made but some plans were formulated. He was told that Medway "wanted [Defendant] eliminated from the street[;]" Defendant was their number one priority. Steven then gave them some information that methamphetamine was being made but that he currently did not know where Defendant was conducting the process. Additionally, at trial, Steven stated that he was not yet aware of the affair between Defendant and his wife at this time. Steven did not have any additional contact with the agents until they came to his residence, on July 26, 2001, and requested permission to search his home. He permitted them to search the house and the rented garage which was located across the street. Steven explained that "[a]ll the belongings that were in the garage were [Defendant's,]" including the lock that was on the garage door.
 {¶ 11} Heather testified that she purchased pseudoephedrine for Defendant but was not told why Defendant needed the drug. She stated that she bought pseudoephedrine for him "once or twice a week for a couple of weeks" and each time she purchased the store limit. Heather recalled seeing cans and hoses lying around the basement that were not there prior to the time Defendant was residing with them. She was later informed by Steven that Defendant constructed a methamphetamine lab in their home. Heather stated that she never saw the lab in the attic and never saw it being moved to its new position however she did see supplies laying around the house. Additionally, Heather witnessed a fire in the bedroom which had access to the attic. Defendant was the only individual in the upstairs area when the fire started; she was downstairs. Defendant never explained how the fire originated. Lastly, Heather informed the jury that she had been convicted of trafficking cocaine.
 {¶ 12} Dyer also testified that she had purchased pseudoephedrine from Wal-Mart per Defendant's request. Defendant had given her and Heather each $10 and told them to go to different cashiers and avoid being seen together. Dyer explained that Defendant indicated that he felt he was being watched because he had been to the store several times. Dyer stated that she initially was not aware of the reasons for the purchase. She later asked Defendant and he told her that "it was one of the ingredients to make crystal meth." However, in a prior statement Dyer indicated that Heather informed her that Defendant needed the sudafed for producing methamphetamines. Dyer maintained that she did not mention Defendant's similar admissions earlier because she was unable to recall them at the time her prior statement was made. Addtionally, Dyer admitted that she was a friend of Heather's and had also been convicted for theft and trafficking cocaine.
 {¶ 13} Ray testified that in June of 2001 she had visited Steven and Heather's home. While she was there she observed Defendant, Steven, and Heather using methamphetamine. Ray recalled seeing Defendant moving buckets and other items from the basement to the attic. She also remember smelling a strong odor in the house.
 {¶ 14} Gerald Hinton ("Hinton"), Agent Charles Defelice, Lt. Steven Glick, Agent Charles Rowland, and Robert Krefft ("Krefft"), also testified at trial. Hinton, of Medway, stated that in June of 2001, intelligence reports indicated that Defendant was selling and producing methamphetamines. He indicated that he was assigned various days to perform a surveillance of Defendant. He was also present for the search of the home and rental garage on Curry Court.
 {¶ 15} Agent Charles Delefice, of Medway, explained that he interviewed Ray on June 7, 2001, and became aware of a methamphetamine lab at Steven and Heather's address. Agent Delefice stated that he met with Steven on July 18, 2001. He indicated that no consideration was given for Steven's Summit County charges. Steven provided Agent Delefice with information about various crack cocaine dealers in Wooster and also offered information about the methamphetamine lab Defendant previously constructed at Steven's home. Steven indicated that Defendant had moved the lab upon his request.
 {¶ 16} On July 26, 2001, Agent Delefice conducted a search of Defendant's mobile trailer home located in Holmes County. Agent Delefice's observations included items consistent with the remnants of a methamphetamine lab. There were also pseudoephedrine blister packs. No items were seized at this search; Agent Delefice explained that the search warrant was not directed at him and he was out of his jurisidiction. Additionally, Agent Delefice stated that on July 26, 2001, he went to 223 Curry Court and obtained Steven's consent to search his home and rental garage. Steven pried Defendant's lock off the garage. Inside, Agent Delefice observed remnants of a methamphetamine lab: buckets, glassware, metal chemical containers, tubing, red phosphorous, kitty litter, a hot plate, etc. Many of these items were located in Defendant's Cadillac. The attic housed similar items: glassware, buckets, tubing, kitty litter, etc. Additionally, wiring from an exhaust fan hook-up was found.
 {¶ 17} Lieutenant Glick was also present at the July 26, 2001, search of Steven and Heather's home. Lt. Glick was responsible for taking photographs of the evidence found and subsequently seized. Lt. Glick testified that the photographs accurately represented what he had observed inside the home and rental garage. The photographs contained images of glassware, tubing, Red Devil lye, siphons, red tinted liquid, filter paper, a coffee grinder with red stain, kitty litter, blister packs from cold medicine, plastic jugs, hypodermic needles and syringes, a cookery pot, a container labeled muriatic acid, and ventilation materials. Lt. Glick recalled that a majority of these items were located in the front compartment of Defendant's car and the trunk. He stated that keys for the trunk were obtained from Defendant; Defendant turned them over when he was arrested.
 {¶ 18} Agent Rowland, of the DEA task force, described the process of making methamphetamine. He broke the process down into several steps and explained how the various items observed in the attic and garage, such as the pseudoephedrine, tubing, glassware, kitty litter, hot plate, etc., are often used in the manufacturing of methamphetamine. Agent Rowland further explained the potential fire hazards of the process as muriatic acid, acetone, and red phosphorous are flammable materials. Additionally, Lt. Glick stated that it was DEA policy to destroy all the items found at a lab site due to the potential hazards of the materials and chemicals involved. Although fingerprint evidence was not obtained, six samples of the liquid contained in the glassware were taken. Four of these samples were obtained from containers located in Defendant's car.
 {¶ 19} Lastly, Krefft, the DEA forensic chemist responsible for the examination of the above-mentioned samples, offered his testimony. Each sample contained traces of the controlled substance methamphetamine or products used in the manufacturing of methamphetamine, namely pseudoephedrine, red phosphorous, alkaline, and iodine.
 {¶ 20} In the case sub judice, the jury had the opportunity to view the witnesses' testimony and adjudge their credibility; therefore, we are to give deference to the jurors' judgments as matters of credibility are primarily for the trier of fact. See State v. Lawrence
(Dec. 1, 1999), 9th Dist. No. 98CA007118, at 13; State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. We find no indication that the trier of fact lost its way and committed a manifest miscarriage of justice in convicting Defendant of illegal manufacture of drugs. This is not a case where the evidence weighs heavily in favor of Defendant, meriting a reversal of the conviction and a new trial. Therefore, we conclude that Defendant's conviction for illegal manufacture of drugs was not against the manifest weight of the evidence. Accordingly, Defendant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II {¶ 21} "Defendant * * * was denied his constitutional right to effective assistance of trial counsel under the Sixth andFourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution."
 {¶ 22} In his second assignment of error, Defendant argues that he was denied effective assistance of counsel. Specifically, Defendant maintains that defense counsel improperly introduced evidence not part of this matter and failed to object to the destruction of material exculpatory evidence. For the reasons stated below, Defendant's assignment of error is not well taken.
 {¶ 23} In order to establish the existence of ineffective assistance of counsel, the defendant must satisfy a two-pronged test: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48, quoting Strickland v. Washington (1984),466 U.S. 668, 687, 80 L.Ed.2d 674.
 {¶ 24} Defendant bears the burden of proof on this matter. Colon
at ¶ 49, citing State v. Smith (1985), 17 Ohio St.3d 98, 100. Furthermore, there exists a strong presumption of the adequacy of counsel's performance, and that counsel's actions were sound trial tactics. Colon at ¶ 49, citing Smith, 17 Ohio St.3d at 100. "A strong presumption exists that licensed attorneys are competent and that the challenged action is the product of a sound strategy." State v.Watson (July 30, 1997), 9th Dist. No. 18215, at 4. Additionally, debatable trial tactics do not give rise to a claim for ineffective assistance of counsel. In Re: Simon (June 13, 2001), 9th Dist. No. 00CA0072, at 4, citing State v. Clayton (1980), 62 Ohio St.2d 45, 49. A defendant should put forth a showing of a substantial violation of an essential duty. Watson, supra, at 6.
 {¶ 25} Prejudice entails a reasonable probability that, but for counsel's errors, the result of the trial would have been different.State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. The court is also to consider "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Colon at ¶ 49, quoting Strickland,466 U.S. at 690. An appellate court may analyze the second prong of theStrickland test alone if such analysis will dispose of a claim of ineffective assistance of counsel on the ground that the defendant did not suffer sufficient prejudice. See State v. Loza (1994),71 Ohio St.3d 61, 83.
 {¶ 26} In this case, Defendant avers that he was denied effective assistance of counsel when his attorney introduced evidence that was allegedly not part of the pending matter and failed to object to the destruction of material exculpatory evidence. After careful review of the record, we find Defendant's arguments are without merit.
 Introduction of Evidence {¶ 27} Defendant avers that his trial counsel "greatly prejudiced [his] defense" when he failed to object to and subsequently elicited testimony, during cross-examination of Agent Defelice, regarding the Holmes County search. However, the transcript reveals that trial counsel's failure to object to the State's questions regarding the Holmes County search was part of his trial strategy. Trial counsel chose to explain to the jury that no evidence was seized and no photographs were taken, rather than object to the questions. It is well settled that "trial counsel's failure to make objections are `within the realm of trial tactics' and do not establish ineffective assistance of counsel."State v. Cureton, 9th Dist. No. 01CA3219-M, 2002-Ohio-5547, at ¶ 55, quoting State v. McCroskey (Apr. 2, 1997), 9th Dist. No. 96CA0026, at 10, quoting State v. Hunt (1984), 20 Ohio App.3d 310, 311. Furthermore, it is not the role of the appellate court to second guess the strategic decisions of trial counsel. State v. Carter (1995), 72 Ohio St.3d 545,558. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"State v. Hodge (Jan. 3, 2001), 9th Dist. No. 3072-M, at 13, quotingStrickland, 466 U.S. at 689. There are numerous ways for counsel to provide effective assistance in any given case. In light of these facts, debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. Clayton, 62 Ohio St.2d at 49.
 {¶ 28} Additionally, counsel functioned effectively at the trial inasmuch as he actively participated by cross-examining the State's witnesses. See State v. Paxton, 9th Dist. No. 01CA007818, 2002-Ohio-221, at 13 (finding effective assistance of counsel where defense attorney thoroughly cross-examined State's witnesses and defendant failed to show prejudice). Therefore, as Defendant failed to satisfy the Strickland
test, his ineffective assistance of counsel claim, as it relates to the introduction of evidence must fail. See Colon at ¶ 48, citingStrickland, 466 U.S. at 687.
 Failure to Object {¶ 29} Defendant maintains that "trial counsel was * * * ineffective in that they failed to object to the State's Crim.R. 26 motion to destroy evidence that potentially posed a hazard to the public." However, as stated above, it is well settled in Ohio that "trial counsel's failure to make objections are `within the realm of trial tactics' and do not establish ineffective assistance of counsel."Cureton at ¶ 55, quoting McCroskey, supra, quoting Hunt,20 Ohio App.3d at 311. To prevail on such a claim, a defendant must first show a substantial violation of defense counsel's essential duties to his client and that defendant was materially prejudiced by counsel's ineffectiveness. State v. Vickers, 9th Dist. No. 01CA007928, 2002-Ohio-3628, at ¶ 23, citing State v. Holloway (1988),38 Ohio St.3d 239, 244.
 {¶ 30} Even if trial counsel's performance was deficient, this alleged error, when considered alone or together with the other alleged instance of ineffective assistance of counsel, cannot be said to have prejudiced Defendant. See State v. Smith, 9th Dist. Nos. 01CA0039 and 01CA0055, 2002-Ohio-4402, at ¶ 114. There was sufficient evidence in the record to convict Defendant absent these alleged errors. We do not find a reasonable probability that, but for counsel's alleged errors, the result of the trial would have been different. See Bradley,42 Ohio St.3d 136 at paragraph three of the syllabus. Accordingly, Defendant's second assignment of error, as it relates to trial counsel's failure to object, has no merit and is overruled.
 {¶ 31} Defendant's assignments of error are overruled. The conviction of the Wayne County Court of Common Pleas is affirmed.
BAIRD, J., BATCHELDER, J. CONCUR.
[1] The State filed an appeal in regards to this ruling. The matter is currently pending in the Ninth District Court of Appeals, State v.Miller, Case No. 02CA0017.